**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BMTH MUSIC LIMITED,

                     Plaintiff,

v.

THE PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

                  Defendants.

Case No. 23-cv-01970

## COMPLAINT

Plaintiff BMTH Music Limited ("BMTH" or "Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

## I. JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over BMTH's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants because Defendants structure their business activities so as to target consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers, offering shipping to the United States, including Illinois, accepting payment in U.S. dollars and,

on information and belief, selling products using infringing and counterfeit versions of BMTH's federally registered trademark (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused BMTH substantial injury in the state of Illinois.

## II. INTRODUCTION

3.     BMTH filed this case to prevent e-commerce store operators who trade upon BMTH's reputation and goodwill from further selling and/or offering for sale Unauthorized Products.  Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers.  E-commerce stores operating under the Seller Aliases share identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences.  Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate BMTH's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their counterfeiting operation. BMTH is forced to file this action to combat Defendants' counterfeiting of its registered trademark, as well as to protect consumers from purchasing Unauthorized Products over the internet.  BMTH has been, and continues to be, irreparably damaged through consumer confusion and dilution of

its valuable trademark because of Defendants' actions and therefore seeks injunctive and monetary relief.

### III. THE PARTIES

4.     BMTH Music Limited is a private limited company having its principal place of business in the United Kingdom and is the owner of the trademark asserted in this action.

5.     Bring Me the Horizon is a band, formed in 2004, that consists of Matthew Nicholls, Oliver Sykes, Lee Malia, Jordan Fish, and Matthew Kean. Bring Me the Horizon is one of the most divisive groups in metal due to their fearlessness in favoring innovation over complacency.  Bring Me the Horizon has had a profound influence on the Metalcore, Alternative Metal, Alternative Rock, Pop Rock, Electronic Rock and Deathcore Music genres.  While the band's second album, *Suicide Season*, was a turning point for the band, it was their third album, *There Is a Hell Believe Me I've Seen It. There is a Heaven, Let's Keep It a Secret*, that propelled them into international fame and recognition.  The style of their early work has been described primarily as deathcore but over the course of their career, the band has shifted their style by combining their approach to metalcore with elements of electronica, pop, and hip hop.

6.     BMTH has been nominated for and/or won numerous awards for its music. The band has won four Kerrang! Awards, including: (1) two for Best British Band, (2) one for Best Live Band, and (3) one for Best Song in 2022 for its hit "DiE4u".  They were also nominated for Best Rock Album for its album, *amo*, at the 2020 U.S. Grammy Awards.  The band also has success on the UK and US charts: BMTH's fifth studio album, *That's the Spirit,* debuted at number two on the Billboard 200 while BMTH's sixth studio album, *amo*, became their first UK number one album.  Recently, BMTH announced they will be spending the summer of 2023 touring North America with famous Chicago-based band Fall Out Boy.

7.     With a strong fan-base, BMTH markets and sells a variety of products emanating from Bring Me the Horizon, including hoodies, t-shirts, beanies, baseball caps, posters and other merchandise bearing the BRING ME THE HORIZON trademark (collectively, "BMTH Products").  BMTH Products have become enormously popular and even iconic, driven by BMTH's quality standards and innovative designs.   Among the purchasing public, BMTH Products are instantly recognizable as such.  BMTH Products are distributed and sold to consumers through retailers throughout the United States, including through authorized retailers in Illinois like Hot Topic, and through BMTH's official website, www.bmthofficial.com.

8.     BMTH has used the BRING ME THE HORIZON trademark for many years and has continuously sold products under its trademark (the "BMTH Trademark").  As a result of this long-standing use, strong common law trademark rights have amassed in the BMTH Trademark.  BMTH's use of the mark has also built substantial goodwill in the BMTH Trademark.  The BMTH Trademark is a famous mark and valuable asset of BMTH.  BMTH Products typically include the BMTH Trademark.

9.     The BMTH Trademark is registered with the United States Patent and Trademark Office and is included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 4,113,438 | BRING ME THE HORIZON | March 20, 2012 | Apparatus, instruments and media for recording, reproducing, carrying, storing, processing, manipulating, transmitting, broadcasting and retrieving publications, texts, |

| | | | signals, software, information, data, code, sound and images, namely DVDs, cassettes in class 009. |
| --- | --- | --- | --- |
| | | | Printed matter and publications, namely, posters, stickers, all relating to music and/or performances by a musical artist, a musical band or a musical group in class 016. |
| | | | Articles of clothing, namely, shirts, T-shirts, shorts, dresses, sweat-shirts, belts, socks, sports clothing, namely, shorts; footwear; head wear in class 025. |
| | | | Ornamental novelty badges and novelty buttons in class 026. |
| | | | Entertainment services, namely, live performances by musical artists, a musical band or a musical group, live music concerts by musical artists, a musical band or a musical group and |

| | | | personal appearances by musical artists, a musical band or a musical group; providing entertainment information; organization and presentation of dances, raves, parties, concerts, live show performances, theatrical and cinematic performances and social entertainment events; organization of games and sports competitions; publishing of magazines; music publishing services; lending library services; production of sound recordings; production, direction, recording and publishing of videos and films; production of video and computer game software and multimedia publishing of computer software; productions of film, radio, television and Internet entertainment services, namely, live performances by musical artists, a |
|---|---|---|---|

| | | | musical band or a musical group, live music concerts by musical artists, a musical band or a musical group and personal appearances by musical artists, a musical band or a musical group, all of the aforesaid services being offered via the Internet, the World Wide Web and/or via communications networks; providing information relating to music and entertainment provided on-line from a computer database or from the Internet in class 041. |
|---|---|---|---|

10. The above U.S. registration for the BMTH Trademark is valid, subsisting, and in full force and effect, and is incontestable pursuant to 15 U.S.C. § 1065. The registration for the BMTH Trademark constitutes *prima facie* evidence of its validity and of BMTH's exclusive right to use the BMTH Trademark pursuant to 15 U.S.C. § 1057(b). A true and correct copy of the United States Registration Certificate for the BMTH Trademark is attached hereto as **Exhibit 1**.

11. The BMTH Trademark is exclusive to BMTH and is displayed extensively on BMTH Products and in marketing and promotional materials. The BMTH Trademark is also distinctive when applied to BMTH Products, signifying to the purchaser that the products come from BMTH, or its licensees, and are manufactured to BMTH's quality standards. Whether

BMTH manufactures the products itself or contracts with others to do so, BMTH has ensured that products bearing the BMTH Trademark are manufactured to the highest quality standards.

12.     The BMTH Trademark is a famous mark, as that term is used in 15 U.S.C. § 1125(c)(1), and has been continuously used and never abandoned.  The success of Bring Me the Horizon, in addition to the marketing of BMTH Products, has enabled the BMTH Brand ("BMTH Brand") to achieve widespread recognition and fame and has made the BMTH Trademark one of the most well-known marks in the music industry.  The widespread fame, outstanding reputation, and significant goodwill associated with the BMTH Brand have made the BMTH Trademark a valuable asset of BMTH.

13.     Products bearing the BMTH Trademark have been the subject of substantial and continuous marketing and promotion.  BMTH has marketed and promoted, and continues to market and promote, the BMTH Trademark in the industry and to consumers through its website www.bmthofficial.com, through traditional print media, authorized retailers, social media sites, and point of sale material.

14.     BMTH has expended substantial time, money, and other resources advertising, promoting, and marketing BMTH Products.  BMTH Products have also been the subject of extensive unsolicited publicity due to the longstanding success of the BMTH Brand.  As a result, products bearing the BMTH Trademark are widely recognized and exclusively associated by consumers as being high-quality products sourced from BMTH or BMTH's licensees.  The BMTH Trademark has achieved tremendous fame and recognition, adding to the inherent distinctiveness of the mark.  As such, the goodwill associated with the BMTH Trademark is of immeasurable value to BMTH.

15.     BMTH Products are sold only by BMTH or through authorized licensees and are recognized by the public as being exclusively associated with the BMTH Brand.

16.     Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to BMTH.  On information and belief, Defendants reside and/or operate in primarily Asian countries or other foreign jurisdictions and redistribute products from the same or similar sources in those locations.  Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

17.     On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto.  Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for BMTH to learn Defendants' true identities and the exact interworking of their counterfeit network.   If Defendants provide additional credible information regarding their identities, BMTH will take appropriate steps to amend the Complaint.

### IV. DEFENDANTS' UNLAWFUL CONDUCT

18.     The success of Bring Me the Horizon has resulted in significant counterfeiting of the BMTH Trademark.  Because of this, BMTH has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps.  Recently, BMTH has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms like AliExpress.com ("AliExpress"), Amazon.com, Inc. ("Amazon"), Dhgate.com ("DHgate"), eBay, Inc. ("eBay"), Etsy, Inc. ("Etsy"), and ContextLogic, Inc. d/b/a Wish.com ("Wish"), including the e-commerce stores operating under the Seller Aliases.  The Seller Aliases target consumers in this Judicial

District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 2**).

19.     Because counterfeit products sold by offshore online counterfeiters do not enter normal retail distribution channels, the US economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id.* When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of counterfeit products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of counterfeit goods costs the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

20.     Online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 4**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin

selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders." Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 4** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186-187. Specifically, brand owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order." *Id.* at p. 161.

21.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offering shipping to the United States, including Illinois, accepting payment in U.S. dollars and, on information and belief, selling and/or offering for sale Unauthorized Products to residents of Illinois.

22.     Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars in multiple ways, including via credit cards, Alipay, Amazon Pay, and/or PayPal. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish

their stores from an authorized retailer. BMTH has not licensed or authorized Defendants to use the BMTH Trademark, and none of the Defendants are authorized retailers of BMTH Products.

23.    Many Defendants also deceive unknowing consumers by using the BMTH Trademark within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to BMTH Products. Other e-commerce stores operating under the Seller Aliases omit using the BMTH Trademark in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for BMTH Products.

24.    E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

25.    E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

26.    Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and

quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

27. E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and through websites such as sellerdefense.cn, ikjzd.com, kaidianyo.com, and kuajingvs.com. These websites provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. The websites also tip off e-commerce store operators like Defendants of new intellectual property infringement lawsuits filed by brand owners, such as Plaintiff, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

28. Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite BMTH's enforcement. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to plaintiffs.

29. Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from BMTH have, jointly and severally, knowingly and willfully used and continue to use

the BMTH Trademark in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

30.     Defendants' unauthorized use of the BMTH Trademark in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming BMTH.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

31.     BMTH hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

32.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the BMTH Trademark in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  The BMTH Trademark is a highly distinctive mark.  Consumers have come to expect the highest quality from BMTH Products offered, sold, or marketed under the BMTH Trademark.

33.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the BMTH Trademark without BMTH's permission.

34.     BMTH's United States registration for the BMTH Trademark is in full force and effect.  Upon information and belief, Defendants have knowledge of BMTH's rights in the BMTH Trademark and are willfully infringing and intentionally using infringing and counterfeit versions of the BMTH Trademark.  Defendants' willful, intentional, and unauthorized use of the BMTH

Trademark is likely to cause, and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

35.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

36.     BMTH has no adequate remedy at law, and if Defendants' actions are not enjoined, BMTH will continue to suffer irreparable harm to its reputation and the goodwill of the BMTH Trademark.

37.     The injuries and damages sustained by BMTH have been directly and proximately caused by Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

38.     BMTH hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

39.     Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with BMTH or the origin, sponsorship, or approval of Defendants' Unauthorized Products by BMTH.

40.     By using the BMTH Trademark in connection with the offering for sale and/or sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

41.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

42.     BMTH has no remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of the BMTH Brand if Defendants' actions are not enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, BMTH Music Limited, prays for judgment against Defendants as follows:

1)     That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a.  using the BMTH Trademark or any reproductions, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a BMTH Product or is not authorized by BMTH to be sold in connection with the BMTH Trademark;

   b.  passing off, inducing, or enabling others to sell or pass off any product as a BMTH Product or any other product produced by BMTH, that is not BMTH's or not produced under the authorization, control, or supervision of BMTH and approved by BMTH for sale under the BMTH Trademark;

   c.  committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of BMTH, or are sponsored by, approved by, or otherwise connected with BMTH;

   d.  further infringing the BMTH Trademark and damaging BMTH's goodwill; and

   e.  manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner,

products or inventory not manufactured by or for BMTH, nor authorized by BMTH to be sold or offered for sale, and which bear the BMTH Trademark;

2) Entry of an Order that, upon BMTH's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms such as AliExpress, Amazon, DHgate, eBay, Etsy, and Wish shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the BMTH Trademark;

3) That Defendants account for and pay to BMTH all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the BMTH Trademark be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that BMTH be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the BMTH Trademark;

5) BMTH is further entitled to recover its attorney's fees and full costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 29th day of March 2023.    Respectfully submitted,

<u>/s/ Martin F. Trainor</u>
Martin F. Trainor
Sydney Fenton
TME Law, P.C.
3339 S. Union Avenue
Chicago, Illinois 60616
708.475.1127
martin@tme-law.com
sydney@tme-law.com

*Counsel for Plaintiff BMTH Music Limited*